**Sprague v. Walter**

*James E. Beasley,* for plaintiff.
*David H. Marion,* for defendants.

KREMER, *J.,* September 23, 1982—Defendants have filed a "Petition for Disqualification and Recusal" in this defamation action brought by Richard Sprague, the former First Assistant District Attorney of Philadelphia, against Philadelphia Newspapers, Inc. (the publisher of the Philadelphia Inquirer and the Philadelphia Daily News) and some of the Inquirer reporters and editors. They request that the trial judge disqualify himself "on the grounds that his impartiality is subject to serious question"; that "he has publicly exhibited a bias and prejudice against defendants" and that "his continued participation in this matter would be improper and create an appearance of impropriety."

A major shadow is cast over defendants' present petition for disqualification by the history of de-

fendants' prior actions seeking disqualification of other judges (and all Philadelphia Judges) in this matter.

This case was initially specially assigned to Judge James R. Cavanaugh. On objection by defendants, Judge Cavanaugh recused himself. The matter was then specially assigned to Judge Harry A. Takiff who apparently recused himself because, *inter alia*, his son is employed by defendant publisher.

The matter was then assigned to Judge G. Fred DiBona on July 2, 1973. Defendants filed a motion to disqualify Judge DiBona.[1]

In the meantime, after the assignment to Judge DiBona, the defendants sued then President Judge Jamieson and (all of the Judges of) the Court of Common Pleas in the Supreme Court of Pennsylvania.[2] Defendants filed a "Petition for Writ of Prohibition and for Assignment of a Judge from outside Philadelphia County." All proceedings in the lower court were stayed pending disposition of the petition. The Supreme Court denied and dismissed the petition on October 9, 1973. The meaning of the Supreme Court's order is clear—the case is to be tried by a Philadelphia Judge. That is the law of this

---

1. The docket entries do not reflect the filing of this motion. Obviously, it was filed. The parties never fully complied with this court's order dated August 10, 1981, to arrange for the prothonotary to complete all necessary docket entries and to place the very voluminous record into proper order.

2. Philadelphia Newspapers, Inc., Greg Walter, Kent Pollock, Howard Shapiro, Eugene L. Roberts, Jr., Creed C. Black, Michael Pakenham and Aaron Epstein vs. D. Donald Jamieson, President Judge, and Court of Common Pleas of Philadelphia County, Supreme Court of Pennsylvania, 1973, no. 450, Miscellaneous Docket no. 19.

case. The Supreme Court's order was a command that this matter be tried to a conclusion without permitting further recusal machinations. Initially this court was willing to try this case and was fully satisfied that that would be done fairly and impartially. This opinion is to set forth the reasons why this court has changed its mind and has decided to withdraw from further handling of this case.

Judge DiBona overruled the motion for his disqualification on December 19, 1973. He handled the matter continuously thereafter. Judge DiBona died on January 31, 1980, during the pendency of this matter. After Judge DiBona's untimely death the matter was assigned to Judge Edward Rosenwald. On May 12, 1981 Judge Rosenwald recused himself at the request of defendants' counsel without any formal motions appearing of record. The matter was then assigned to Judge Kremer on June 2, 1981. Judge Kremer is the fifth judge to be assigned to this matter.

Defendants with a mixture of arrogance, insolence and insensitivity (masquerading as boldness) did not heretofore hesitate to make personal attacks on both Judges Cavanaugh and DiBona, by reciting that defendant newspapers had written articles about alleged activities by members of their families.

When this case was first assigned to the individual calendar of this trial judge defendants took no steps whatsoever to raise any question of disqualification. A notice of scheduling of a pre-trial conference on July 20, 1981 was sent on June 25, 1981. No question of disqualification was raised during this period. The court expended some considerable effort in reviewing and collating a "carton-full" of prior proceedings. At the pre-trial conference the court *sua sponte* raised the ques-

tion of recusal to dispose of it. Counsel for defendants stated that he did not then move for recusal and that he did know whether he wished to file a recusal motion. The court regarded this as a waiver. (Defendants' statement in their petition that they asked for recusal at the pre-trial conference is *not* correct.) Nevertheless, the court, in its pre-trial memorandum, granted leave to file a written recusal motion of record. The court also ruled that plaintiff could take discovery of the net worth of any defendant. The case was scheduled for trial on a date certain and the attorneys were attached, without any objection. That also was in the nature of a waiver so far as this court was concerned.

Thereafter, a "Petition for Disqualification and Recusal" was filed. It is alleged in the petition that the trial judge, "both as a practicing attorney and as a member of the judiciary, has for years been an outspoken critic of the press in general, and of The Inquirer and Daily News in particular." Defendants quote from various supposed "remarks, speeches and public appearances over the years" in which the trial judge allegedly severly criticized Philadelphia Newspapers, Inc., defendant newspaper publisher of The Philadelphia Inquirer and the Daily News.

In his affidavit in support of recusal, David H. Marion, Esq., stated, *inter alia,* as follows:

"1. I was requested by the Justice Lodge of B'Nai Brith to participate in a debate held on January 19, 1976 with I. Raymond Kremer on the subject "The Philadelphia Press . . . Does it act responsibly?" . . . Although the discussion was supposed to deal with the Philadelphia press in general, then attorney Kremer during that debate specifically referred to The Philadelphia Inquirer, including a case where he represented then Mayor Rizzo against the

Philadelphia Inquirer and had tried to obtain a prior restraint on publication and republication of a March 10, 1976 article which had appeared in the Philadelphia Inquirer's Sunday magazine supplement. It is my recollection that he also referred to facts involved in the case brought by Richard Sprague against the Philadelphia Inquirer. In the debate, after I made my presentation and Mr. Kremer made his presentation, the very first comment I made in my rebuttal was that 'I detected a mild degree of displeasure toward my client, The Philadelphia Inquirer.' The statement was greeted with laughter from the audience because it was an obvious understatement of the extraordinary personal hostility toward the Philadelphia Inquirer evidenced in Mr. Kremer's remarks during his presentation."

The facts as recited by defendants and Mr. Marion, in particular, just did not happen. It is unnecessary for this court to enter into a credibility contest with these litigants or Mr. Marion. Mr. Marion's falseness of statement and falseness of affidavit is preserved and frozen in time because what he swore to did not happen and could not have happened—unless there was some type of Star Trek warping of time. It was not possible on *January 19, 1976* to debate and discuss a Rizzo case which did not even occur until *March, 1976*. In January, 1976 the trial judge in this case had not even personally met Mayor Rizzo. The so-called Rizzo Libel case is docketed at Rizzo v. The Philadelphia Inquirer, et al., Court of Common Pleas of Philadelphia County, March term, 1976, no. 2560.

The events did not commence or take place until March, 1976, *after* the January 19, 1976 "debate."

The falseness and duplicity about the Rizzo case in the Marion affidavit were used for the purpose of hinging to it a supposed reference to the Sprague case which also never occurred. Mr. Marion's affidavit and assertion of fact were at best, using a kind description, a flimsy, foolish and incompetent error; or , at worst, using a less kind description, a calculated, contrived falsehood and perhaps, devious perjury. The real significance is that the petition for recusal and its exhibits are replete with error, exaggeration and distortion and improper and inaccurate innuendo. This "reference to Rizzo" falsehood "examples" the technique of exaggeration and attack which has been adopted with a vengeance by defendants and defendants' counsel for the purpose of achieving a disqualification. It is as unworthy as the technique of referring to the fact that defendant newspapers printed articles that a member of a judge's family was accused of crime, as was twice done earlier in this case.

Defendants recite in their petition that this court stated "that the press is irresponsible, unfair and unobjective, seeks profits rather than truth, treats judges and lawyers as scapegoats, and panders to the public's enjoyment of smears against judges and lawyers." Defendants state that this court is personally biased against defendants. Defendants in support of their descriptions, cite their own (frequently anonymous) writings. To put it mildly, that is not a trustworthy source.

This court does not know the individual defendants in this matter and has [probably] not met them and has no recollection of ever meeting any of them, with the exception of Mr. Packenham. To the best of this court's recollection, the few contacts (years ago) with Mr. Packenham were cordial and respectful. As a matter of fact, so far as this court

knows, all of the individual defendants have good reputations.

Defendants contend that the court has publicly criticized the accuracy and honesty of the press. That is certainly at least partially correct.

It is not necessary for this court to concern itself with the petitioners' characterizations as to the court's views of media responsibility. The court has frankly and openly made comments in published opinions.[3]

In Rouse Philadelphia, Inc. v. Ad Hoc '78, 19 D. & C. 3d 627, 632 (1979) (sometimes called The Gallery Case or re Milton Street) this court stated:

"The suppression of the dissemination of ideas is the gravest of dangers. Nothing is to be barred from communication be it called treason or heresy. The heresies of today may prove to be the truths of tomorrow and the treasons of today may prove to be tomorrow's needs for social change. We must be ever vigilant that the voice we silence is not that of some present-day Galileo. Such high-sounding language is easier to come by when we speak of Galileos. The rights of the poor and the residents of the slums may be in more need of protection. But even the poor and the disposed must speak within the boundaries of the law.

There are few eternal verities. Heraclitus recited one that all is change and one cannot step into the same river twice. And Einstein recited another that all of physical reality is relative. In these senses social actions and relations are also in constant motion; man is evolving socially as well as physically. The freedom of man to think and to express himself is crucial to social evolution. It is in the

---

3. Copies of these opinions were sent to the general press, but were not acknowledged or printed.

memory of that experience that we owe a maximum loyalty to the First Amendment. Our decision is in keeping with this command."

In Com. v. Theodore D. Brooks, et al., 1 Phila. 440, 485, 486 (1978) this court stated:

"Does an increasingly concentrated Press have too much monopoly over free speech and the First Amendment? Does the Press act responsibly and in good faith in giving others adequate access to expression of their views? When the Press is accused of suppressing the truth or of distorting the truth or of outright falsification, it has an obligation to the public to give broad and sufficient access to such adversary positions. Otherwise, the fact of the matter is that the Press uses its First Amendment privileges to suppress the ideas of others and to deprive them of their First Amendment rights. Was it intended by the framers of the Constitution that First Amendment rights would become the private property of some few journalistic giants?

At meetings of the Board of Judges, certainly one of the most responsible groups in the City, one hears, almost *without dissent,* that it is useless to attempt to reply to improper District Attorney or Press conduct or to attempt to correct falsehoods and distortions foisted by both; that the media has the last word and is simply not going to give up the value of sensationalism and the profit of the hunt and the smear. That is a devastating indictment of the press and media.

There is a public right to be properly informed. There is a public right to be free from deceit and manipulation by half-truths, exaggerations, distortions and falsehood. Since it is far too dangerous to make such achievement by any manner of limiting the press, we must search for some reasonable ex-

pansions of the rights of all to receive facts and truth in a fair manner. At the very least, there is a duty of responsible community elements to speak out. It is no secret that for ten years the author of this opinion has in hundreds of speeches stated that the press is the last of our institutions which has resisted the consumerist movement; that it has failed to deliver a proper product to a bewildered public."

A court has the right to have its own individual philosophy. It has the right to entertain views without subjecting itself to motions for recusal.

Litigants cannot and should not be permitted to achieve the disqualification of judges based upon their supposed philosophical beliefs or leanings as supposedly reflected by cases in which they were involved as attorneys, or by speeches or prior opinions made while they were attorneys or judges.

Defendant newspapers, by their counsel, repeat in their petition as they have in their columns that this court was "paid in excess of $74,000 by the City of Philadelphia for his defense of the Mayor." The payment was primarily for *defense of the City*[4] since it was the city which would have had to pay any damages. The petition omits mention of the fact that the city was a defendant and one of the primary defendants. As a matter of fact, the payment was in excess of $115,000 on a time basis (as contrasted to payment by the defendant newspa-

---

4. Philadelphia Newspapers, Inc. v. The Philadelphia, Pennsylvania Building and Trades Construction Council and Thomas J. McGrann (et al.) and Frank L. Rizzo, Mayor of the City of Philadelphia and Joseph F. O'Neill, Commissioner of Police of the City of Philadelphia, United States District Court for the Eastern District of Pennsylvania, Civil Action no. 76-847.

pers to their counsel in excess of $200,000) and was completely proper. It is difficult to understand why such assertion is pertinent—it is not. This court thinks in terms of gratitude that the defendants' forensic "shenanigans" gave rise to such a well-earned fee.

From this court's observation of actual events, it is an article of cardinal importance that the press rewrites history and it does so with overwhelming effectiveness because so frequently there are no available alternatives for correction and publication. For example, in the petition for disqualification the defendants' counsel cleverly blurs two cases in which this court was involved as a practicing attorney.

In one case the court represented Mayor Rizzo as an individual in a libel action for damages[5] against the Philadelphia Inquirer and there was no fee charged because the case was taken on a contingency concept. In the other case the court represented the City of Philadelphia (and collaterally Mayor Rizzo and Police Commissioner O'Neill) against defendant newspapers' claim for alleged damages as a result of interference with press publication by a labor group. Thousands and thousands of pages of depositions were taken and eventually defendant newspapers just dropped the action against the City after arrangement of a face-saving agreement about future city handling of certain types of disputes. During the course of this court's successful handling of the depositions not a *scintilla* of bona fide evidence was produced that the City or Mayor Rizzo or Police Commissioner O'Neill

---

5. Defendant newspapers always refer to this case as an action for a prior restraint, although that was only a brief and minor feature in the case. The main thrust was for damages.

were in any way whatsoever responsible for or involved in the labor unions' actions at the newspaper plant. All the repetitive media references are to the contrary and are false. Facts and history are thus rewritten, distorted or falsified and are forever lost in the press process of quoting itself.

Under the law of Pennsylvania the burden is on the party seeking disqualification to prove bias: Com. v. Council, 491 Pa. 434, 421 A. 2d 623 (1980). A judge's refusal to recuse himself will be overturned only if there has been an abuse of discretion: Crawford's Estate, 307 Pa. 102, 160 A. 585 (1931). The question is one which is particularly ill suited for review by appellate courts. Thus, the issue of recusal is addressed particularly and peculiarly to the conscience and sound discretion of the judge. It is his inquiry.

The appellate rule and settled law that a judge's refusal to recuse himself will be overturned only if there is an abuse of discretion[6] does not give comfort to the judge who must make such decision. That rule only sharpens the need for *bona fide* inquiry which the judge must make into his own conscience and increases his burden of seeking to make a proper decision.

In Crawford's Estate, 307 Pa. 102, 160 A. 585 (1932) our Supreme Court stated that when a judge considers disqualification he must give due consideration to the fact that the administration of justice should be beyond the appearance of unfairness. The court continued (at 108-109):

" . . . while the mediation of courts is based upon the principle of judicial impartiality, disinterestedness, and fairness pervading the whole system of

6. Crawford's Estate, 307 Pa. 102, 160 A. 585 (1932).

judicature, so that courts may as near as possible be above suspicion, there is, on the other side, an important issue at stake; that is, that causes may not be unfairly prejudiced, unduly delayed, or discontent created through unfounded charges of prejudice or unfairness made against the judge in the trial of a cause. It is of great importance to the administration of justice that such should not occur. If the judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final unless there is an abuse of discretion. This must be so for the security of the bench and the successful administration of justice. Otherwise, unfounded and oft-times malicious charges made during the trial by bold and unscrupulous advocates might be fatal to a cause, or litigation might be unfairly and improperly held up awaiting the decision of such a question or the assignment of another judge to try the case. If lightly countenanced, such practice might be resorted to, thereby tending to discredit the judicial system. The conscience of the judge alone is brought in question; he should, as far as possible, avoid any feeling of unfairness or hostility to the litigants in a case."

In: Wallace v. Jameson, 179 Pa. 98, 36 A. 142 (1897) defendants were members of the press. They had published articles critical of the judge before whom an unrelated libel case was to be tried. The trial judge sent a letter to one of defendants critical of the articles and the defendant. The Supreme Court held that since "neither the letter nor the matters referred to in it had any connection with the present suit" there was no showing of an interest which would disqualify the judge. The court stated that "objections which merely relate to the judge's personal opinions or feelings, and not to

[any] legal interest in the case or the question [or issues] . . . must be addressed to his [sole] discretion." In this case the court has no disqualifying interest in the case. In unrelated matters the court has been critical of the press in general and defendants in particular. It must be borne in mind, however, that defendant publisher is in virtual sole and exclusive control of the press in Philadelphia. In net effect there is no other press-game in town.

Mr. Marion makes reference to the fact that this court on December 19, 1980 recused itself in an unrelated defamation action involving the Philadelphia Magazine,[7] as though that has some special significance. As indicated by the court (in the letter attached to the petition for recusal as Exhibit "J") the court recused itself because Mr. Marion's partner called the court *ex parte* and endeavored to influence the court. The case, it must be significantly noted, involved a waiver of jury trial. The court cautiously stated, in that letter, long before this Sprague case was assigned, "I believe that I would have been quite able to handle the matter fairly and impartially. I would not have recused myself but for Mr. Savett's and your positions. Such recusal is *not* a precedent so far as I am concerned." That is still this court's position.

In another unrelated equity matter,[8] in which Mr. Savett was a counsel, this court was specially assigned to hear the case after this court was suggested as being a judge in whom counsel had confidence "with respect to . . . fairness and ability

---

7. James Reginald Edgehill v. Municipal Publications, Inc., D. Herbert Lipson and Alan Halpern, C. P., Phila. County, May Term, 1972, no. 2371.

8. Goldfinger v. Samuel Rappaport Associates, C. P. Phila. County, May Term, 1981, no. 2042.

to deal with complex legal and, perhaps, factual issues." The case involved bitterly feuding litigants and lawyers and the City of Philadelphia and the District Attorney. The court knew the parties and counsel. Not only was no suggestion made for disqualification but Mr. Savett requested and urged that the court use conciliatory skills and efforts. A difficult and personally bitter and vindictive matter was then settled by the court.

Mr. Marion and Mr. Savett and Mr. Klein have not been granted a right to choose who will sit on their cases. So long as this court feels it can and will sit impartially, it will decline recusal.

Petitioners also refer to the matter of Dr. Jay C. Smith v. Sam S. McKeel, et al.,[9] a defamation action against various officers and employees of P.N.T., wherein this court dismissed a petition by plaintiff. The court noted in its order "The court considered any question of disqualification, *sua sponte* and declined recusal." Petitioners now state this order recognized "the possible impropriety of his sitting on any matter involving defendants." That is not correct. This court routinely considers the recusal question in all cases where the court knows any party or any counsel. There is no doubt but that this court runs into more recusal questions than usual, because as an attorney he represented hundreds of attorneys and many judges. The court has declined recusal in all cases where it was satisfied that it could perform its judicial duties impartially. It may be repeated—so long as this court feels it can and will hear and decide impartially, it will decline recusal.

---

9. Smith v. McKeel, et al., C. P. Phila. County, Sept. Term, 1980, no. 370.

There is a sometimes forensic tactical usage of arrogance and insolence in attacking and criticizing a judge to lay a foundation for and to predicate accusations of bias and consequent motions for recusal. In a sense it might be styled judge-baiting. When done within the framework of the canons of professional ethics, it is still within the ambit of representing a client to the best of one's ability. On the other hand, it should be deemed improper and unethical for an attorney to initiate and foster a dispute with a judge for the purpose of then seeking the judge's disqualification. The judicial system has the right and duty to protect itself and its judges from inappropriate manipulations and unwarranted attacks.

An example of calculated insolence by defendants' counsel is the assertion that this court's August 18, 1981 order "constitutes an attempt by the trial judge whose disqualification is sought to engage in discovery to develop a factual record." The court had entered an order, after consultation with the calendar judge and the administrative judge, that the parties file a schedule as to their pending litigation, and that they file a schedule as to which judges they would seek recusal or as to whom they would agree. With the advice and consent of both the calendar judge and the administrative judge, the court endeavored to place the record into a proper posture for possible assignment to a judge acceptable by agreement of all parties, although there is certainly no requirement for such agreement.

After a motion is made or other actions taken, coupled with a studied effort to insult, bait and alienate the court, the appearance may seem unavoidable that there has been some stir of hostility. However, the recusal motion should not be permit-

ted to enable one litigant to fashion and control the roster of who will or will not sit and preside on its cases.

The greatest possible caution should be exercised before a trial judge recuses himself for factors arising out of conduct initiated by a party or its counsel, particularly where that conduct appears to be deliberate and improper or appears to be calculated to initiate a dispute with the court. Misconduct should not be rewarded by (in effect) giving the wrongdoer the power to select the judge or judges before whom it is willing to appear.

Defendants also refer to a case initiated by summons by this court against defendant newspapers in about March, 1978. A complaint was never filed and the matter was never pursued. The case lay fallow for years and was discontinued prior to the assignment of this case to this court. This court filed a "Petition for Special Assignment of an Out-of-County Judge" in that case. In that petition this court stated, *inter alia,* as follows:

"2. . . . The defendants are a complex of extraordinarily powerful and wealthy newspapers and other interests and constitute one of the major real governing and influential forces in and about the City of Philadelphia.

3. . . . The plaintiff has not yet filed his complaint in this matter . . . The complaint has not been heretofore filed because the plaintiff has been cautioned again and again that it is impossible to combat defendants' pervasive influences and that defendants will continue to publish and act maliciously and vindictively while continuing to take improper advantage of the First Amendment shield.

4. This suit, in general, will involve three or

more instances of libel and slander. This suit will involve questions as to whether the defendants used their newspapers and influences for inter alia, specifically malicious vindictive and vengeful purposes.

5. This petition is filed pursuant to the law and guidance set forth in Com., ex rel. Joy Armor (now Stanziani) v. David Armor, 263 Pa. Superior Ct. 353, 398 A. 2d 173 (1978), [which] indicates that an out-of-county judge should be appointed [in a case involving an in-county judge].

6. The subject matter of this action may be of public interest and concern involving two major Philadelphia newspapers of general circulation, and important constitutional issues related to serious abuses of freedom of the press and press failures to protect the First Amendment rights of private citizens."

The three instances of libel referred to in the petition are set forth in a separate footnote attached hereto. (Editor's note: See special footnote following order.)

As time passed, this court felt that the matters were not important enough and that it was not worth the effort to get involved in litigation. No complaint was prepared or filed and the case was simply abandoned.

It has been held that to be sufficient for disqualification a bias must be a personal one arising outside the four corners of the courtroom. See Hodgson v. Liquor Salesmen's U. Loc. No. 2 of State of N.Y., 444 F. 2d 1344 (2nd Cir. 1971); U.S. v. Bray, 546 F. 2d 851 (10th Cir. 1976). Any alleged bias and prejudice must not arise out of evidence presented at trial or out of an earlier proceeding or from the fact that the judge has definite views on the law or

from an impersonal prejudice which goes to the judge's background, associations, learnings or experience. Com. v. Lawrence, 211 Pa. Superior Ct. 279, 239 A. 2d 209 (1967). U.S. v. Gilboy, 162 F. Supp. 384 (M.D. Pa. 1958). Adverse rulings in a previous proceeding, whether or not correct, and the judge's statements of reasons do not constitute a bias requiring recusal and are insufficient to warrant a disqualification. U.S. v. Bray, supra.

On the surface, it would seem simple that where the judge previously became engaged in actual litigation with a defendant, the judge should consider recusal. However, that is not the necessary result where defendant is a major newspaper and defendant causes libel litigation.

This court is of the opinion that the usual rules re recusal are not necessarily applicable to the press in local situations. There are at least three distinguishing features, all of which threaten the independence and integrity of the judiciary:

(1) the first lies in the fact that the press may be regarded as being at times in the very business of committing libel or of risking libel.

Too frequently, in relation to the judiciary, the press exploits and panders to the basest and most mediocre emotions of jealousy, envy and hatred. Too frequently, the press holds hostage a judge's name and reputation and those of his family.

(2) the second lies in the fact that the press exercises enormous control over and impact upon the elective destinies of judges.

For example, the Philadelphia press takes upon itself the role of endorsing or disapproving of candidates for judicial office.

A clear use of the press for purposes of influencing judicial elections may be found in press conduct during election or re-election campaigns. When, for

example, a columnist prints a ballot on the 2nd page (first news page) and advises a readership of approximately 450,000 to take the ballot to the polls that is more than the equivalent of an enormous campaign contribution—indeed, an unevaluated and unreported campaign contribution. When, for example, the major newspaper in the area prints editorials endorsing certain judges and when it prints a list of recommended judges on its editiorial pages, that is far more valuable than any contribution. It is sometimes done on a daily or repetitive basis. All of this is quite legal.

However, does that mean that all who were omitted from selection are subject to press motion for disqualification? Are all of those who accepted such invaluable support—and undoubtedly hope for it again in the future—subject to motion for disqualification?

(3) the third lies in the fact that the press (and its companion media) more and more assumes the role of an ungoverned and unbalanced fourth branch of government. The evolving role of the press, more than ever before, seeks to influence and control the selection and operation of the judiciary. There is an intensifying dilemma because history commands that we cannot and must not abridge press freedom. At the same time this institutional confrontation between press and judiciary occurs without really subjecting the press to any of the checks and balances which were deemed essential to a tripartite governmental system. If the press is truly to be regarded as the equivalent of a branch of government, then we have a quadripartite governmental system. In the absence of any operative checks and balances we become in net effect substantially governed and manipulated by an unrestrained and unrestrainable press-institution. In this context

the independence of the judiciary is of paramount and crucial importance. In this context the action for libel may be the only check or balance to media irresponsibility.

The merits of a press motion for recusal cannot be addressed without first considering this relationship between the press and the judiciary and their respective roles in our society.

It is uncontroverted that a free press serves an extremely important role. For that reason the Founding Fathers included in the Bill of Rights the First Amendment, which provides that "Congress shall pass no law . . . abridging the freedom of speech, or of the press;. . . ." A major purpose of the First Amendment is to protect free discussion of governmental affairs: First National Bank v. Belotti, 435 U.S. 765, 98 S. Ct., 1407, 55 L. Ed. 2d 707, reh. den., 438 U.S. 907, 98 S. Ct. 3126, 57 L. Ed. 2d 1150 (1978), for without such freedom, our society could not long continue to exist in its democratic form. The press has therefore been accorded special protections against prior restraints on publication. See, e.g., Near v. Minnesota, 283 U.S. 697, 51 S. Ct. 625, 75 L. Ed. 1357 (1931); New York Times Co. v. U.S., 403 U.S. 713 (1971). The press has also been accorded special protection for defamation. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

The judiciary plays an equally important role in our society. It is the courts that adjudicate disputes. It is the courts that are the ultimate protectors of individual rights and liberties. It is the province of the judiciary to say what the law is: Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803). An independent and impartial judiciary is an in-

dispensable cornerstone of our political system. The fact that judges in Pennsylvania do not have lifetime tenure and the fact that they are elected officials affect the press-judiciary relationships. Judges in Pennsylvania on the one hand, are to be independent and impartial servants of justice. On the other, they are elected officials. Sometimes they must speak out on issues of public concern. They have a right to make their views known to the public with regard to matters affecting the justice system. One of the hopeful benefits is that the public will have a better understanding.

The same obligation is placed upon the press: inform the public in order that they may make intelligent judgments on matters of public interest. Since both the press and the judiciary speak out on public matters, it is not surprising that they may have different opinions. Each has the right to disagree with the other's position. Just as it is within the rights of the press to criticize members of the bench for the performance of their duties, so may members of the bench criticize the press for the performance of its duties.

The fact that given members of the press and the bench are at philosophical or ideological odds with each other is *not* to be deemed automatic grounds for judicial disqualification if the two meet in court as judge and litigant. It is for the judge to decide if their disagreement is so strong or so fundamental or so particularized as to prejudice him in the performance of his judicial function in a specific case.

The very nature of the disagreements between press and bench may bring forth strong words on both sides. Yet such rhetoric does not, and should not, affect the performance of their respective roles in our society. When an elected judge is unjustly criticized in the press, he should respond. When he

does not, the respect of the public for the courts continues to be diminished. It is in the sense that a libel suit by a judge against a newspaper may sometimes be his only effective rebuttal to false or distorted reporting or false criticism. It is in that sense that such action may be an alert to the public that there has been journalistic fabrication.

According to defendants, a public exchange of rhetoric is enough to give a newspaper party grounds to disqualify a judge from presiding over its cases. This theory would allow the press to exclude judges by the simple expedient of drawing fire from the bench. Certainly, one never sees a motion to disqualify the press from its publications and it is obvious there is no forum for such motion. The fact is that the press does not usually reveal the sources of its attitudes and policies and does not disclose its conflicts as judges and attorneys are ethically required to do. If a judge is so awed by the power wielded by the press so that he will not respond to unjust or distorted charges and criticisms, it is questionable as to whether he possesses the requisite independence to sit impartially on such case.

In the space of a few short months Philadelphia has gone from a multiple newspaper city to a single newspaper (publisher) city. With the demise of the Journal and the Bulletin the process of newspaper monopoly has intensified. The overwhelming influence and power of an increasingly concentrated and virtually monopolized press is becoming a matter of gravest concern.

It is one thing to speak of First Amendment rights and privileges, it is another matter, indeed, to contemplate a monolithic press in substantial anonymous control of community communication, without any effective restraints of ethical codes or equal

access to rebuttal and the right to be heard. Our First Amendment rights are in the grasp of too few. The crucial need for competition of ideas in the marketplace is controlled by too few. In the past it may have been enough to restrain the hand of government. But today a very small group restrains the real access of all to First Amendment rights. When the press is controlled and is not fair, the competition of ideas becomes distorted and lost.

It is not in the public interest to add to press power by permitting press defendants to successfully suppress judicial ideas in the fields of libel law, procedures and damages or in any other area.

Without timidity defendants' counsel have submitted a list of 14 judges whom they suggest to be trial judge in this case. One of the judges is a former associate of defense counsel; another has already recused himself once in this matter and his son still works for defendant newspaper publisher. Two of the others have just completed a campaign for judicial office in which defendant newspapers strongly supported their election. The favorable publicity and newspaper space given to them was probably more valuable than any campaign contribution. The intense favorable publicity and election support followed shortly (several weeks) after their names were proposed as trial judge in this matter.

An independent judiciary is as important as an unfettered press. Each should use its powers fairly and with caution. To allow the press to engage in policies of attacking judges and thereby enable themselves to choose the judges before whom they will try their cases, directly or indirectly, would be to allow an abuse of power.

There is far more danger in the surrender of local judicial independence to the press, than there is

from the prospect of some isolated judge supposedly bruising press independence. The press should not be permitted to intimidate or sway judges of lesser resolve. A trial judge tries a case—be it a libel case or otherwise—in the glaring sunlight of an open courtroom. His function of impartiality is performed under the microscope of media analysis. Judicial conduct is recorded and preserved for review from Philadelphia to Harrisburg to Washington.

*The most important single fact is that this case is to be tried by jury and the jury will make the decision.* The very task of a judge is to preside impartially. That function of impartiality is performed in the open courtroom.

It is the instinct and also the deliberate purpose of the press to seek control over the minds of the public. In any effort to resist press control, the judiciary is lacking in virtually all equipment and full communication ability. The worst of journalism too frequently snaps like jackals at the heels of the judiciary, too often motivated by little better than a desire to make noise, and to injure and to sensationalize and to sell newspapers. The major strength of the judiciary is its independence. Needs for re-election undesirably thrust judges into the arms of politics and into the clutches of the press and inspire too many at times with fear of the media.

It is in that context that we question the (press) technique of using a motion for recusal as a means of judge-shopping, and as a means of controlling who shall sit in cases involving the press.

The merest act of supposed judicial impropriety could invoke the awesome punitive powers of the Judicial Inquiry and Review Board, including even removal of the judge. The basest, cruelest, vindic-

tive and most irresponsible sadisms or distortions of the press subject it to no similar control whatsoever. Only the action for libel and the needs of profit limit or shape press conduct. Neither a newspaper nor a journalist places a license to practice the profession at stake for unethical or dishonest or incompetent conduct.

The press does not truly engage in critical self-analysis and does not truly engage in critical self-governance. In the Kremer-Marion debate this court recommended, *inter alia,* that an ombudsman be established for the press, with real power to ensure correction of errors and improprieties. Certainly, an ombudsman could aid the independence of the judiciary. This court also recommended that the press adopt and be bound by an effective code of journalistic ethics, which they impose upon themselves. There is no similar code for the press. These ideas were ignored and were not even publicized though the audience consisted in substantial part of leading Philadelphia journalists. These ideas and others were repeated in other public speeches. They were ignored. The press, when it is in institutional disagreement with a critic may treat that person as a non-person and may treat his ideas and words as non-existent. This technique finds usage in the Soviet Union.

Chief Justice Warren E. Burger made the following comment[10] about the courts. It is equally applicable to the press. ". . . Unreviewable power is the most likely to self-indulge itself and the least likely to engage in dispassionate self-analysis . . . In a

---

10. Warren E. Burger, then District of Columbia Circuit Court Judge, to Ohio Judicial Conference on September 4, 1968.

country like ours, no public institution, or the people who operate it, can be above public debate."

Defendants have argued that the due process clause of the Fourteenth Amendment requires disqualification. In Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S. Ct. 1610, 1613, 64 L. Ed. 2d 182, 188 (1980), the court stated:

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. See Carey v. Piphus, 415 U.S. 247, 259-262, 266-267, 98 S. Ct. 1042, 1043, 1050-1052, 1053, 1054, 55 L. Ed. 2d 252 (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. See Mathews v. Eldridge, 424 U.S. 319, 344 (1976). At the same time it preserves both the appearance and reality of fairness, 'generating the feeling, so important to popular government, that justice has been done,' Joint Anti Facist Committee v. McGrath, 341 U.S. 123, 162 (1951) (Frankfurter, J. concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him."

See Carey v. Piphus, 435 U.S. 247 (1978); Mathews v. Eldridge, 424 U.S. 319 (1976); Joint Anti Facist Committee v. McGrath, 341 U.S. 123, 71 S. Ct. 624, 95 L. Ed. 817 (1951).

It is sufficient to note that this court was satisfied it could and would comply with all of the requirements of due process. Plaintiff also has a right to due process which includes the right to have his case heard by a judge uninfluenced by the vastness of defendants' power. Plaintiff is just as entitled to an impartial trial as are defendants.

Canon 3 of the Code of Judicial Conduct provides in relevant part:

"A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned including but not limited to instances where

(a) he has a personal bias or prejudice concerning a party . . ."

See also A.B.A., Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge, Section 1.7 (Approved Draft 1972).

Of equal importance is the rule that there is an obligation to resist recusal when there is no real reason or need for such action. See United States v. Bray, 546 F. 2d 851 (10th Cir. 1976). In the A.B.A. Standards the comment to Section 1.7 provides: "Unless otherwise required by statute, a Judge should avoid withdrawing from a case merely because a charge of bias has been made. (citation omitted). Demands for recusation can be used as an indirect means of attempting to choose the judge who will sit on the case. (citation omitted)."

Canon 1 of the Code of Judicial Conduct provides that A Judge Should Uphold the Integrity and Independence of the Judiciary: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the

integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

Canon 1 remains the "polestar" fixed for the guidance of the courts in the interpretation of the canons. The other canons must be read in terms of that canon and its purposes.

Canon 2 of the Code of Judicial Conduct provides as follows:

"A. A Judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Lord Herschell stated early in this century: "[I]mportant as it [is] that people should get justice, it [is] even more important that they should be made to feed and see that they [are] getting it." 2 J.B Atloy, Victorian Chancellors 460 (1908). Professor MacKenzie rephrased the principle: "[I]t is not enough that Justice merely appear to be done; but the appearance of justice is an indispensable element of justice itself." J. MacKenzie, The Appearance of Justice, 241 (1974). This is also the guidance and instruction of Crawford's Estate, from which we have quoted above; Kramer v. Scientific Control Corp., 534 F. 2d 1085, 1091-1092 (3rd Cir. 1976); Commonwealth v. Kane, 199 Pa. Super. 89, 91 (1962). "[T]he proper administration of justice requires of a judge not only actual impartiality, but also the appearance of a detached impartiality." Rapp v. Van Dusen, 350 F. 2d 806, 812 (3d Cir. 1965). See also U.S. v. Grinnell Corp., 384 U.S. 563, 583, 86 S. Ct. 1698, ____ , 16 L. Ed. 2d 778, 790 (1966); Berger v. U.S., 255 U.S. 22, 31, 41 S. Ct. 230, ____ , 65 L. Ed. 481, ____ (1921); Com. v. Goodman, 454 Pa. 538, 311 A. 2d 652 (1973); Snyder's Case, 301 Pa. 281, 152 A. 33 (1930).

As between Canon 1 and Canon 2 we have made it clear that Canon 1 must prevail. We must not lose sight of the fact that we are mainly concerned with propriety itself, not just its appearances.

Whether there is an appearance of impropriety or propriety depends upon who is telling the story. That is another way of recognizing that it is the press that has the major opportunity and the major facilities to paint the picture.

For example, this court was astonished when the media was able to relate stories and make it appear that this court had acted improperly when it quite properly refused to sentence two young men to prison for smoking on a bus. The appearance of impropriety was created by the press. The actuality of impropriety belonged to and was part of the press' monopoly on news fabrication.

It is the press which governs how propriety will be portrayed to the public. Any arguments by the press as to appearance of impropriety must be most carefully scrutinized and resisted lest that doctrine be misused as another tool for attacks on the independence of the judiciary.

During the pendency of the motion for recusal in this case, one of the counsel called the attention of the Calendar Judge to a letter dated August 13, 1973 in the record which was filed by plaintiff (as one of a series of letters "from various current and former district attorneys, as well as from other highly respected members of the Bar") for use in opposition to a motion for summary judgment which had been filed by defendants. The calendar judge advised this court there was a letter of which this court was not aware. On October 14, 1981, the court entered an order that the parties file or record any letters written by this court with regard to this case.

Counsel for defendants thereupon filed a sup-

plemental affidavit in support of the motion for recusal and attached thereto a copy of the letter. Counsel stated he had not recalled the letter because of a six year idleness in the case. This court certainly did not recall the letter because of a more than eight year lapse of time since the letter was written. The letter was apparently written as a favor. No fee was received. There was no counsel or co-counsel relationship. In this letter the court indicated it had reviewed "the investigative file with regard to" John R. Applegate, Dec'd., and newspaper articles referent to Rocco P. Urella, Jr. The letter sets forth conclusions that there was no possible basis for charging Urella with homicide and that "the ten-year-later dredging up of this matter was a callous abuse of press-power."

The letter stated, "The merest knowledge of or acquaintanceship with modern constitutional law principles make it extremely clear that there never, never was any possibility of indicting or charging either Urella or Scalessa with anything after a lapse of ten years. Therefore, the games played by the press constituted a serious invasion of the privacy of two young men who would never be given any further opportunity to clear their names in a trial, because any reasonable and responsible mind knew that there could be no trial. It is also quite clear that the press had serious conflicts of interest and personal purposes to be served; that the so-called investigative reporting was intended as an attack on Mr. Sprague and not as a bona fide pursuit of a feasible prosecution."[11]

---

11. Some of the assertions made in the supplemental affidavit are unwarranted or false. The letter makes no reference to a Mr. Funk and it simply would not have been written the way it was if the file which was reviewed had indicated a Funk version of a "scuffle."

Perhaps as a matter of technicality this court was not involved as a counsel in the Applegate matter. Certainly, any views the court had eight years ago about facts it does not even remember and which may well have been based upon only a limited submission of information, would not affect the disposition of factual questions, particularly since they would be submitted to a jury. Nevertheless, the letter could be interpreted as some connection with the case or some interest in the case. The letter when thrown into the scales of our consideration could lend an appearance of impropriety even where there is no actual impropriety. We have, therefore, been obliged to reconsider our views with regard to recusal in this particular case.

Defendants' request for disqualification because of an alleged "appearance of impropriety created by the judge's hostile public comments concerning defendants"; because it is not answered and therefore must be treated as "uncontested"; because it allegedly "raises a reasonable question of impartiality"[12] is rejected on all or any of those grounds.

During the pendency of this matter the defendant Greg Walter suffered a heart attack on November 11, 1981 and a continuance was requested until he could physically participate in the defense of the matter. In April, 1982 Mr. Walter was able to resume partial activity and he (and others) commenced a non-jury libel case before Judge Bernard Snyder, which has been on continuous trial

---

12. Defendant has made reference only to federal cases and legislation, which do not reflect the law of the Commonwealth of Pennsylvania: Berger v. U.S., 255 U.S. 22, 33-34, 41 S. Ct. 230, 233, 65 L. Ed. 481, 485-486 (1921); U.S. v. Townsend, 478 F. 2d 1072, 1073-74 (3d Cir. 1973); 13 Wright & Miller, Federal Practice & Procedure, Section 3549; 28 U.S.C. 455; S. Rep. no. 93-419, 93rd Cong. 1st Sess., 1973, p. 5.

through the end of September, 1982. We withheld filing this opinion to give him opportunity to recover his health and to complete that trial.

This court has concluded that upon balance of all of the unusual factors in this *particular* case, the interests of plaintiff, as an innocent and uninvolved party on the question of recusal, would be best-served and most expeditiously served by withdrawal from trial of this case so that it may be tried expeditiously[13] when Mr. Walter sufficiently recovers and so that there is no shadow cast over the finality of the proceedings.

A proper balance between an independent judiciary and a free press is essential. How to adjust the scales of justice is a delicate problem which may never be settled to everyone's satisfaction. The tensions between the institutions of our democracy are often difficult to resolve. We should try.

## ORDER

And now, September 23, 1982, for the reasons set forth in the foregoing opinion, this court overrules the motion of counsel for defendants for recusal of the undersigned as trial judge. The court, acting sua sponte, on the facts and history of this particular case, hereby recuses itself from further participation in this case as the assigned trial judge. The case is hereby referred back to the Calendar Judge, Stanley M. Greenberg and/or the Administrative Judge of the Trial Division, Charles P. Mirarchi, Jr., for reassignment.

---

13. This court will nevertheless shortly rule upon the pending "motion for sanctions for refusal to comply with court's order dated February 18, 1982" so that that matter need not be re-reviewed by a new judge.

## SPECIAL FOOTNOTE

The three instances of libel referred to were as follows:

(1) On March 7, 1978, the Philadelphia Inquirer wrote an editorial on the subject of the appointment of John J. Pettit as the Prothonotary of the Court of Common Pleas. In the editiorial the newspaper made an innuendo that the Republican Judges (without naming any, but having reference to a group of less than 20, which is deemed to be sufficiently identifiable under the law of libel) had acted unlawfully. The editiorial recited:

"On the second secret ballot, Mr. Pettit squeaked through with a 41-39 victory (one abstention). The 19 Republican judges were told by team leader William Meehan to act as stringers for the Rizzo forces. No one is saying whether the Republicans were promised a high patronage choice to be named later or several lowerlevel positions or, who knows, maybe, an undisclosed amount of cash."

This court never discussed the Pettit appointment with any political person, directly or indirectly, and certainly never received anything for its vote, directly or indirectly, from anyone. At the time of the filing of the summons the court considered the editorial to be a deliberate and reckless falsehood intended and calculated to insult, demean and downgrade the Philadelphia judiciary.

There is appended hereto a copy of a letter dated March 9, 1978 sent by this court to the Philadelphia Inquirer. The letter was not acknowledged or printed.

(2) In another instance, one of defendant newspapers wrote articles and editorials and inspired two days of hour-on-the-hour radio editorials, be-

cause this court failed to send two young men to jail for smoking on a bus. Both the Assistant District Attorney and the Defense Counsel had advised the court [which had been sitting for one month following appointment] that it should not and did not have the constitutional power to incarcerate two young men who were indigent and could not pay fines— under the decision of the Supreme Court of the United States in Tate v. Short, 401 U.S. 395, 91 S. Ct. 668, 28 L. Ed. 2d 792 (1971). This was specifically explained to the newspaper's reporter, who wrote the articles anyway, without any reference to the constitutional interdiction against discriminatory jailing of indigents and without any reference to the inappropriateness of sending youths to jail for smoking on a bus, in a situation in which the jails were so crowded as to have been declared to be in violation of constitutional requirements.

At the time of the filing of the summons, the court considered defendants' conduct to have been improper and libelous.

(3) In the third instance this court went to the funeral of the brother of a friend. The brother was allegedly an "organized crime person" and had been briefly represented by this court while he was an attorney. Defendant Daily News noted the attendance and then stated: "Kremer's last publicly recorded link to South Philadelphia was a 1978 reunion of the 4th and Christian Sts. Gang, a group of successful persons who grew up in that neighborhood." This court wrote what it considered to be a rather humorous and sarcastic letter, pointing out that the writer moved from South Philadelphia at the age of nine. It was stated that the reference was a distortion and intended to be a smear. The

letter was not acknowledged or printed. At the time of the filing of the summons the court considered the publication to be a deliberate and malicious distortion.

March 9, 1978

Letters to Editor
Editorial Board
Philadelphia Inquirer
400 N. Broad Street
Philadelphia, Penna.

In your editorial of March 7, 1978, you state: "The 19 Republican judges were told by team leader William Meehan to act as stringers for the Rizzo forces. No one is saying whether the Republicans were promised a high patronage choice to be named later or several lower-level positions, or, who knows, maybe, an undisclosed amount of cash."

I did not get any calls from Mr. Meehan about Mr. Pettit or the Prothonotary vote. I certainly never received any promise of patronage positions or any cash disclosed or undisclosed.

It is requested that you not only print a retraction, but that you clearly admit you made up and invented the "undisclosed amount of cash" insult. If you wish, you have my permission to print another editorial that it is you who causes the public to lose respect for the judicial system with your malicious falsehoods and distortions and invectives.

Very truly yours,
/s/ I. Raymond Kremer
I. RAYMOND KREMER